IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| 12W RPO, LLC, an Oregon limited liability company; and GED GALLERY, LLC, an Oregon limited liability company, | No. 3:17-cv-00037-HZ |
| Plaintiffs, | |
| v. | |
| AFFILIATED FM INSURANCE COMPANY, a Rhode Island corporation, and STEADFAST INSURANCE COMPANY, a Delaware corporation, | OPINION & ORDER |
| Defendants. | |

Michael E. Farnell
Kristopher L. Kolta
PARSONS FARNELL & GREIN, LLP
1030 S.W. Morrison Street,
Portland, Oregon 97205

      Attorneys for Plaintiff

Stuart D. Jones
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204

Attorney for Defendant

HERNANDEZ, District Judge:

Plaintiffs 12W RPO ("12W") and GED Gallery ("GED") bring this breach of contract action against Defendant Affiliated FM Insurance Company.[1] The dispute arises from Defendant's denial of insurance claims made by Plaintiffs related to the failure of plumbing components and certain "spandrel glass" windows used in the construction of a multi-story, mixed-use apartment and office building in Portland.[2] Defendant moves for summary judgment on both the plumbing and spandrel glass claims. Plaintiffs move for partial summary judgment on the spandrel glass claim only. Because I conclude that the insurance policy excludes coverage for both claims, I grant Defendant's motion and deny Plaintiffs' motion.

## BACKGROUND

GED was the developer of "The Indigo @ Twelve West" ("The Indigo"). First Am. Compl. ¶ 10, ECF 41. 12W is The Indigo's current owner and is landlord to The Indigo's residential and commercial tenants. *Id.* ¶ 11. Defendant issued a series of first-party property insurance policies to 12W under which GED is also a named insured. *Id.* ¶ 7.

---

[1] Claims were also originally brought against Defendant Steadfast Insurance Company. Plaintiffs settled with Steadfast and dismissed all claims against it on March 28, 2018.

[2] Plaintiffs also brought a claim related to "hydronic pipe." First Am. Compl. ¶¶ 31-37. In their partial summary judgment motion, Plaintiffs state that they have resolved that claim. Pls.' Mot. for Sum. J. at 1 n.1, ECF 59. Accordingly, without further discussion I grant Defendant's summary judgment motion as to the hydronic pipe claim.

According to the allegations in the First Amended Complaint, The Indigo's hot and cold water plumbing systems were constructed with various materials composed of or containing ethylene propylene diene monomer rubber ("EPDM"). *Id.* ¶ 12. The EPDM components, made by Victaulic Company, included valves, pipe couplings, gaskets, and fittings for piping systems. *Id.*

The EPDM materials failed by decomposing, disintegrating, and in some instances dissolving into sludge. *Id.* ¶ 13. According to Plaintiffs' investigation, the EPDM materials had an "unanticipated chemical reaction" with Portland's water supply. *Id.* ¶ 14. Chloramine compounds, which Portland adds to its domestic water, caused the EPDM materials to "decompose, disintegrate, and/or dissolve." *Id.* This disintegration and dissolution of the EPDM materials resulted in damage to The Indigo's potable water supply, to the domestic water plumbing system, and to other property at The Indigo including damage to both residential and commercial units. *Id.* ¶ 15. After investigating, Plaintiffs concluded that the only viable repair option was to entirely replace The Indigo's plumbing system. *Id.* ¶ 20. As a result, Plaintiffs have incurred total repair costs of not less than $4,826,584. *Id.* ¶ 21. On or about June 18, 2015, Plaintiffs submitted the EPDM claim to Defendant and requested coverage. *Id.* ¶ 27. On or about December 22, 2016, Defendant denied the claim. *Id.*

As to the spandrel window glass, Plaintiffs allege that "opacifier film," which was adhered to spandrel glass units installed at The Indigo, is separating and peeling away from the spandrel glass units, resulting in property damage. *Id.* ¶ 40. At the time the First Amended Complaint was filed in November 2017, the investigation into the spandrel glass issue was ongoing, with estimated repair costs to exceed $6 million. *Id.* ¶¶ 40-42. On or about June 18,

2015, Plaintiffs submitted a separate claim to Defendant regarding The Indigo's spandrel glass units and opacifier film, requesting coverage. *Id.* ¶ 38. On or about July 20, 2015, Defendant denied coverage. *Id.* ¶ 39.

STANDARDS

I. Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Insurance Contract Interpretation

In this diversity action, Oregon law governs the construction of the policies at issue. *Allstate Ins. Co. v. Morgan*, 123 F. Supp. 3d 1266, 1272-73 (D. Or. 2015). The burden of proving coverage is on the insured, while the insurer bears the burden of proving exclusion from coverage. *Id.* at 1273 (citing *ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 349 Or. 117, 127, 241 P.3d 710 (2010)).

The "question of [insurance] policy interpretation is one of law, and [the court's] task is to determine the intent of the parties[.]" *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 307, 985 P.2d 1284, 1287 (1999) (citation omitted); *see also Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or.*, 313 Or. 464, 469, 836 P.2d 703, 706 (1992) ("[T]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties.") (internal quotation marks and brackets omitted). The court determines the parties' intent "from the terms and conditions of the policy." *Groshong*, 329 Or. at 307, 985 P.2d at 1287.

Courts first examine the wording of the policy, "applying any definitions supplied by the policy itself and otherwise presuming that words have their plain, ordinary meanings." *Tualatin Valley Hous. Partners v. Truck Ins. Exch.*, 208 Or. App. 155, 159-60, 144 P.3d 991, 993 (2006) (citing *Hoffman*, 313 Or. at 469-70, 836 P.2d 703). When the policy does not define the terms at issue, the court "resort[s] to various aids of interpretation to discern the parties' intended

meaning." *Groshong*, 329 Or. at 307-08, 985 P.2d at 1287. The court first examines the plain meaning of the term at issue. *Id.* at 308, 985 P.2d at 1287. If at that point the court determines there is only one plausible interpretation of the disputed terms, the analysis ends there. *Id.*

If the meaning of the term or phrase at issue "is not, on its face, plain, [the court] proceed[s] to [its] second aid to interpretation[-] . . . examin[ing] the phrase in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole." *Id.* at 312, 985 P.2d at 1289 (internal quotation marks omitted). A term is ambiguous if "two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continues to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole." *Hoffman Constr.*, 313 Or. at 470, 836 P.2d at 706. If, after the court analyzes the terms in the broader context of the policy, the court determines that the term remains ambiguous, the term is to be construed against the insurer, the party which drafted the policy. *Hoffman*, 313 Or. at 470-71, 836 P.2d at 706-07. The *Hoffman* court explained:

> [W]hen two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail, *then* the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive. It must be resolved.

*Id.*

On the other hand, where the contract unambiguously expresses the intent to provide coverage or to not provide coverage, the contract language is controlling. *See Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 67 Or. App. 623, 627, 679 P.2d 879, 881 (1984) (where contract language is unambiguous, courts will "apply those terms and will not create coverage where none

was intended by the contract.").

DISCUSSION

Defendant argues that for both the EPDM and spandrel glass claims, policy exclusions preclude coverage and preclude application of the "ensuing" or "resulting" loss provision as an exception to any exclusion. Further, Defendant argues that the EPDM and the spandrel glass claims are untimely because (1) the damage commenced before Defendant issued its first policy to Plaintiffs; and (2) the damage commenced more than two years before Plaintiffs filed suit and the untimely claims are not saved by the parties' tolling agreements.

In response to Defendant's motion as to the EPDM claim, Plaintiffs argue that the plumbing system was damaged by concurrent, multiple causes and because one of those is a covered loss, the loss is not excluded. Plaintiffs further argue that even if the loss is excluded, it is nonetheless covered under the ensuing/resulting loss provision. Plaintiffs contend that the loss did not commence as to the EPDM material until the entire plumbing system failed which was within a policy period and that at a minimum, certain replacement plumbing parts were damaged within the two-year suit limitations period. In response to Defendant's motion on the spandrel glass claim, as well as in support of their own motion for partial summary judgment, Plaintiffs make similar concurrent cause and ensuing loss arguments. As to the timeliness arguments, they contend that damage to the spandrel glass units commenced within the policy period and that each unit of spandrel glass should be treated separately and thus, the lawsuit was timely filed as to many of the spandrel glass units, some of which have not yet suffered damage.

After setting forth the relevant policy provisions, I discuss the EPDM coverage arguments, followed by the spandrel glass coverage arguments. Because I agree with Defendant

on the coverage arguments, I do not discuss the timeliness arguments.

I. Policy Language/Provisions

Beginning in 2009, Defendant and 12W were parties to several successive one-year insurance contracts. Jones Decl. ¶¶ 23-35, ECF 58; *id.*, Exs. 22-33 (pages from annual policies from July 13, 2009 to September 13, 2017). While there appear to be some differences in the policies as time when on, the parties do not suggest that these differences are material or relate to the issues in this case. Thus, I cite to language from the first policy issued July 13, 2009 and found at Exhibit 22 to the August 1, 2018 Jones Declaration.

In the Declarations page of the policy, under "Insurance Provided," the policy sates: "All risks of direct physical loss or damage, as defined and limited herein, on Real Property, Personal Property, Business Interruption, including the Extensions of Coverage applying at the following described locations: . . . ." Jones Decl., Ex. 22 at 3. Form PRO AR 3100 (1/07) addresses the coverage. *Id.* at 5. It is entitled "All Risk Property Coverage" and states, under the heading "Perils Insured," that "[t]his policy insures against all risks of direct physical loss or damage to insured property except as excluded under this policy." *Id.*

Another section of the policy, under the heading "Group II," addresses exclusions. *Id.* at 6. It begins with the following statement: "This policy does not insure against loss or damage caused by the following; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered." *Id.* Following that statement is a list of seven exclusions, some of which are at issue here. *Id.* at 6-7.

II. EPDM Claim

Defendant concedes that under the broad grant of coverage in an all-risk policy, damage

to the EPDM plumbing components is initially covered. *See, e.g.*, *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *7 (D. Or. June 8, 20020 (in an all risk policy, "'the insured's burden is limited. The insured need only show that a physical loss occurred to covered property'") (quoting *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. Civ. 98-434-HU, 1999 WL 619100, at *4 (D. Or. 1999)). Thus, the issues in Defendant's motion as to the EPDM claim are whether an exclusion applies to deny coverage, and if so, whether the ensuing loss provision creates an exception to the exclusion so that coverage is ultimately available to Plaintiffs.

A. Defendant's Asserted Design Defect Exclusions

Defendant argues that the following design defect exclusions preclude coverage: latent defect, faulty design, materials defects, and faulty workmanship/construction. Jones Decl., Ex. 22 at 6 (Group II, Exclusion Nos. 1, 2). In their Response Memorandum, Plaintiffs state that the "EPDM plumbing fittings . . . were defective, a fact Plaintiffs do not . . . dispute[.]" Pls.' Resp. 9, ECF 63. They also later note the variety of what they call "defect-oriented" exclusions asserted by Defendant: "latent defect, faulty design, defective materials, faulty workmanship, and deterioration." *Id.* at 15. Plaintiffs concede that they have pressed "certain of these theories" against the manufacturer and contractors. *Id.* But, they argue that they stand by those arguments because in the end, their loss is still covered under a concurrent/multiple loss theory or under the ensuing loss provision as an exception to the exclusions. *Id.*

The parties' positions establish that there is no dispute regarding the application of at least the faulty design exclusion and possibly other design or product defect exclusions. Thus, at this point, it is undisputed that there is initial coverage which is then excluded.

B. Plaintiff's Concurrent/Multiple Loss Theory

Plaintiffs contend that when "a force external to the design defect comes to operate on the material and physically damages it, the coverage question changes: did a non-excluded peril contribute to the loss or damage?" Pls.' Resp. 10. Plaintiffs argue that when a covered cause and excluded cause of loss converge to cause damage, the loss or damage is covered in the first instance. They argue that here, for example, the EPDM would not have decomposed and the plumbing system would not have been lost but for the chloramine-treated water. Because chloramine-treated water is not an excluded cause of loss, Plaintiffs argue that Defendant's design-defect exclusion arguments are incomplete. They assert that three non-excluded/covered perils contributed to the loss: (1) the "unanticipated chemical reaction between EPDM and chloramine-treated water"; (2) the wholesale decomposition of the EPDM which is not a "case of mere deterioration"; and (3) Victaulic's failure to warn. *Id.* at 15-16.

Plaintiffs' argument is unpersuasive. In both *Berry v. Commercial Un. Ins. Co.*, 87 F.3d 387 (9th Cir. 1996), and *Estate of Konell v. Allied Prop. & Cas. Ins. Co.*, No. 3:10-cv-955-ST, 2013 WL 3791141 (D. Or. July 19, 2013), the most relevant cases Plaintiffs rely on, the courts made clear that a concurrent or multiple loss theory depends on proof that the non-excluded cause or peril is the "proximate efficient cause" of the damage. In *Berry*, the Ninth Circuit considered an insurance claim where the insured had flushed a fungicidal liquid into her aluminum irrigation pipes only to have those pipes become damaged a year or two later. 87 F.3d at 388. The insurer denied the claim based on a "deterioration" exclusion. On appeal, the insured argued that "deterioration" was not the sole cause of damage to her pipes, but that the fungicide manufacturer's negligent failure to warn her that its products would cause the insured's

aluminum pipes to disintegrate was a second, independent cause without which there would have been no damage. The insured argued that the court was required to examine which cause was the "proximate efficient cause" of the damage and determine whether that cause was covered or excluded by the policy. *Id.* at 389.

The Ninth Circuit explained that under California law, use of the "proximate efficient cause" analysis is "limited to situations where there exists a causal or dependent relationship between covered and excluded perils." *Id.* (internal quotation marks omitted). The *Berry* court used a three-part test in its analysis of the claim: (1) was this a case of single or multiple causation; (2) if it was a case of multiple causation, was the "proximate efficient cause" of the pipe damage the fungicide manufacturer's negligent failure to warn or was it the deterioration of the pipes; and (3) if the "proximate efficient cause" was the negligence of the manufacturer, was that covered or excluded under the policy? *Id.* In determining the proximate efficient cause of the damage, the appropriate inquiry was whether it was the "predominating or moving efficient cause." *Id.*

In *Estate of Konnell*, Judge Stewart indicated that *Naumes, Inc. v. Landmark Ins. Co.*, 119 Or. App. 79, 849 P.2d 554 (1993), controlled the concurrent cause issue under Oregon law. She explained that in that case, the Oregon Court of Appeals adopted the "efficient proximate cause" analysis for resolving what it called "multiple causes of a single loss." *Id.* at *2 (citing *Naumes*, 19 Or. App. at 82, 849 P.2d at 555). As Judge Stewart explained in *Estate of Konnell*, a policy exclusion will not preclude coverage if, when there are multiple causes of a loss, a covered peril is the "efficient proximate cause" of the loss/damage. *Id.* at *4 ("the efficient proximate cause is a rule of law that applies only when two or more perils combine in sequence to cause a loss and a

*covered peril* is the predominant or efficient cause of the loss. In such a situation, the efficient

proximate cause rule mandates coverage, even if an excluded event appears in the chain of

causation that ultimately produces the loss.") (internal quotation marks omitted). Thus, if there

are multiple causes of a loss and a covered peril is the efficient proximate cause, then even

though another cause is an excluded cause of the loss/damage, the loss/damage is nonetheless

covered. *Naumes*, 119 Or. App. at 82, 849 P.2d at 555 ("If there are multiple causes of a single

loss, the efficient proximate cause is the relevant cause for determining coverage under an

insurance coverage."). In contrast, if the proximate efficient cause is an excluded peril, the loss

is not covered. *See Alex R. Thomas & Co. v. Mut. Serv. Cas. Ins. Co.*, 98 Cal. App. 4th 66, 72,

119 Cal. Rptr. 2d 394, 398 (2002) (under California "proximate efficient cause" analysis, if "the

predominant cause is an excluded peril, the loss is not covered").

Plaintiffs here rely on *Berry* and *Estate of Konnell* to support their argument that when a

manufacturer's failure to warn, chloramine exposure, or decomposition, each of which they

contend is a non-excluded and thus covered peril, combines with an excluded peril to produce

loss or damage, coverage to the insured results. Thus, here, for example, Plaintiffs contend that

even if a design defect or deterioration, which are excluded perils, caused the loss or damage to

the plumbing system, because the damage would not have occurred absent the failure to warn,

the failure to warn allows coverage. Plaintiffs, however, fail to even mention the "efficient

proximate cause" test. Thus, they offer an incomplete analysis and proof of this theory.

Plaintiffs must prove, or at least create an issue of fact regarding, that the failure to warn,

chloramine "chemical attack," or decomposition meets the "efficient proximate cause" standard

as set forth in *Naumes*, meaning that any one of these was "the active and efficient cause that sets

in motion a train of events which bring about a result without the intervention of any force, starting and working actively and efficiently from a new and independent source." *Naumes*, 119 Or. App. at 82, 849 P.2d at 555.  But Plaintiffs fail to do so and it is not the Court's burden to make Plaintiff's argument as to whether one of these other causes is the efficient proximate cause.  Because Plaintiffs do not support their argument under the proper legal standard, they fail to create an issue of fact as to the concurrent/multiple cause theory.  Thus, even assuming that any one of the three alleged concurrent causes is a non-excluded covered peril, they cannot defeat Defendant's motion with this argument.

C.  Ensuing/Resulting Loss Provision

All of the exclusions at issue in the EPDM claim are in "Group II" which starts by stating: "This policy does not insure against loss or damage caused by the following; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered."  Jones Decl., Ex. 22 at 6.  The second clause, beginning with "however," is an ensuing or resulting loss provision.[3]  Because such provisions are an exception to an exclusion, the burden of proving that such an exception applies falls to the insured.  *Uptown Mkt., LLC v. Ohio Sec. Ins. Co.*, 286 F. Supp. 3d 1160, 1165 (D. Or. 2018) (citing *Employers Ins. v. Wausau v. Tektronix, Inc.*, 211 Or. App. 485, 514, 156 P.3d 105, 122 (2007)), *appeal dismissed*, 2018 WL 4372417 (9th Cir. July 24, 2018).

"[A] resulting or ensuing loss clause operates to carve out an exception to the policy

---

[3]  The difference in terminology between a "resulting loss" provision and an "ensuing loss" provision is insignificant.  *Vision One, LLC v. Phil. Indem. Ins. Co.*, 174 Wash. 2d 501, 513 n.6, 276 P.3d 300, 306 n.6 (2012) ("Resulting loss clauses are sometimes denominated ensuing loss clauses. The distinction is simply a matter of different wording among insurance policies. There is no legal significance to using one phrase over the other").

exclusion." *Vision One*, 174 Wash. 2d at 514, 276 P.3d at 307. Such clauses "limit the scope of

what is otherwise excluded under the policy" and "ensure that if one of the specified uncovered

events takes place, any ensuing loss which is otherwise covered by the policy will remain

covered." *Id.* at 515, 276 P.3d at 307 (internal quotation marks omitted). "The uncovered event

itself, however, is never covered." *Id.* (internal quotation marks omitted). And, "[e]nsuing losses

may not cover losses that are otherwise excluded." *Id.* (discussing *Wright v. Safeco Ins. Co. of*

*Am.*, 124 Wash. App. 263, 109 P.3d 1 (2004) (in case where defective construction allowed

water to seep through the walls and caused mold damage, the ensuing loss exception to the

defective construction exclusion did not apply to allow coverage for mold damage because the

policy also excluded all losses caused by mold; "[a]lthough mold damage arguably would have

been covered under the ensuing loss clause, the fact that the policy excluded *all* losses caused by

mold was dispositive). Thus, an ensuing loss clause does not "operate to provide coverage for a

specifically excluded loss." *Id.*

Plaintiffs argue that the damages they seek are for ensuing/resulting physical damage to

the plumbing system. They point to Defendant's policy commentary regarding the

ensuing/resulting loss provision:

> The Policy excludes costs of correcting or replacing faulty workmanship, material,
> construction or design. However, the resulting insured physical damage is
> covered.
>
> As an example, an improperly designed beam fractures, causing the roof to
> collapse. The cost to repair the fractured beam and the collapse damage is
> covered, but not the cost to redesign and upgrade any damaged beams, or beams
> of the same design that were not damaged and used elsewhere in the building.

Kolta Aug. 15, 2018 Decl., Ex. 2 at 8, ECF 64. Plaintiffs then analogize the EPDM claim to

Defendant's example:

> [I]mproperly designed [EPDM components sloughed apart in pieces], causing the [plumbing system to fail.] The cost to repair the [disintegrated EPDM] and the [plumbing damage] is covered but not the cost to redesign and upgrade any damaged [EPDM components] or [EPDM components] of the same design that were not damaged and used elsewhere in the building.

Pls.' Resp. 9; *see also id.* at 15 (stating that under the ensuing loss provision, a defect exclusion applies only to the costs of repairing the defective components themselves). Thus, while certain design-related repair costs are excluded, Plaintiffs argue that the "resulting damage and loss to the plumbing system as a whole and associated replacement costs caused by the wholesale decomposition of the plumbing fittings therein would be covered." *Id.* at 15.

Defendant does not quibble with the ensuing/resulting loss theory generally. But, here, Defendant argues, all of the ensuing losses are otherwise excluded and thus, there is no coverage for them. Defendant explains:

> The plumbing valves and fittings installed in The Indigo were made of defective materials (excluded), the defects were latent defects (excluded), the selection of those valves for use in The Indigo was a design defect (excluded), and the installation of these defective valves and fittings was faulty construction (excluded).
> According to the 12W Plaintiffs, immediately upon contact with city water, the EPDM in the valves and fittings throughout The Indigo began to deteriorate (excluded) as the result of a chemical reaction between the chloramine in the water and the surfaces of the EPDM materials. Damage to the fittings began in the form of mottling and changes in texture (excluded). A contaminant (*i.e.*, particles and residue of the EPDM containing what 12W represented to others as a carcinogen, *i.e.* carbon black) was released into the potable water for the condominium building. The EPDM particles and residue rendered the water impure, contaminating the water (excluded) and depositing the contaminant throughout the plumbing system (excluded).

Def.'s Reply 3-4, ECF 65 (citations and internal quotation marks omitted). According to Defendant, because the resulting loss was caused by deterioration and contamination, both of

which are excluded perils, Plaintiffs cannot restore coverage via the ensuing loss provision. I agree with Defendant.

### 1. Deterioration

The policy excludes "loss or damage" caused by "deterioration[.]" Jones Decl., Ex. 22 at 6 (Group II, Exclusion No. 1) (excluding "[w]ear and tear, deterioration, inherent vice, latent defect, vermin or insects.").[4] The term "deterioration" is not defined in the policies. Based on dictionary plain meaning definitions, Defendant contends the term means the gradual, progressive, breakdown of the products installed in The Indigo. Defendant relies on several cases, including *Berry*, the Ninth Circuit case which considered damage to piping caused by a fungicide which had been flushed through irrigation pipes. There, the court, relying on California state cases, explained that "deterioration" includes "slow-moving disintegration or corrosion of the insured material because of external forces." 87 F.3d at 389 n.3 (internal quotation marks and brackets omitted) (citing *Brodkin v. State Farm Fire & Cas. Co.*, 217 Cal App. 3d 210, 265 Cal. Rptr. 710, 714 (1989); *Butki v. United Servs. Auto. Ass'n*, 225 Cal. App. 3d 464, 274 Cal Rptr. 909, 910 (1990)). *Berry* held that the degradation at issue in the case, which took "two years to manifest," was "slow-moving" and thus was "deterioration." In another case cited by Defendant, the court looked at Webster's Dictionary to discern the plain meaning of "deteriorate," noted its ordinary definition as "to make inferior in quality or value," "gradual impairment" and "degenerate," and then went on to further consider the dictionary definitions of

---

[4] In a later version of the policy, "depletion, rust, corrosion, [and] erosion" are added to the Group II, Exclusion No. 1 list of exclusions, and "vermin or insects" are moved to their own separate exclusion at Exclusion No. 8. *E.g.*, Jones Decl., Ex. 28 at 6 (policy for Sept. 13, 2013 to Sept. 13, 2014). The parties do not suggest that the definition of deterioration is changed by the later policies' inclusion or omission of other listed exclusions in Exclusion No. 1.

"gradual" and "degenerate." *Atlantic. Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292, 1303 (E.D. Wis. 2005) (concluding "mold and rot cause deterioration when they impair the degree of quality or value of property as part of a gradual and progressive process").

In support of its position that the deterioration exclusion applies here, Defendant cites to (1) pleadings in the products liability case filed by 12W against Victaulic, *12W RPO, LLC, et al v. Victaulic Co.*, No. 3:15-cv-01411-MO ("the *Victaulic* case"); (2) representations made by Plaintiffs' employees; (3) representations by Plaintiffs' expert in the *Victaulic* case as well as in this one; and (4) representations made by Plaintiffs' counsel in the *Victaulic* case, all referring to the basis of the EPDM damage as deterioration. Jones Dec., Ex. 19 ¶ 10 (Complaint in the *Victaulic* case alleging that the EPDM products are "prematurely deteriorating and failing" and that the "deterioration of the EPDM products has resulted in damage"); *id.*, Ex. 20 ¶ 12 (Third Amended Complaint in *Victaulic* case containing similar allegations); *id.*, Ex. 9 at 8, 12-14 (statements by Plaintiffs in a letter to "GED staff and [illegible]" or to "Indigo guests" or "Indigo residents" that "[l]ate last year we learned that a standard plumbing part . . . was starting to deteriorate and could potentially leak"; that "[t]he valves and couplings affected have an EPDM rubber gasket that may be deteriorating due to the type of water present in Portland"; that "these parts are susceptible to break down or deterioration when they come into contact with chloramine, . . ." ); *id.*, Ex. 9 at 17-20, 26-28 (Plaintiffs' EPDM expert Roger Bekooy referring to deterioration); *id.*, Ex. 9 at 21 (12W Response to Interrogatories in the *Victaulic* case stating that "Victaulic was aware of the propensity for EPDM to deteriorate," was aware that "its product was deteriorating when exposed to chloramines," and describing that when EPDM deteriorates into water, it releases carbon black, a possible carcinogen).

Defendant also notes that a recent version of the report issued by Plaintiffs' EPDM expert Roger Bekooy used in the instant litigation, substitutes the word "decomposition" for "deterioration." *Compare* Jones Decl., Ex. 15 at 1 (June 15, 2018 Bekooy Report entitled "Decomposition of Victaulic Plumbing Components Containing EPDM"); *with id.*, Ex. 16 at 1 (Apr. 14 2017 Bekooy Report entitled "Deterioration of Victaulic Plumbing Components Containing EPDM").

Finally, Defendant notes that in a sworn interrogatory answer given earlier in this case, Plaintiffs agreed that they used the term "deterioration" in the *Victaulic* case to "describe both the initial, superficial damage and at times the much more profound damage that followed[.]" Jones Decl., Ex. 11 at 4 (Pls.' Resp. to Def.'s Interrogs.). In that interrogatory response, Plaintiffs also argued that their use of "deterioration" in the *Victaulic* case is of limited relevance here because the distinctions between deterioration, decompensation, or disintegration were not relevant in the *Victaulic* case. *Id.*

Plaintiffs contend that the loss that occurred here is not the result of "deterioration," but is instead the result of the wholesale decomposition of the EPDM products and that such decomposition is distinguishable from deterioration. Pls.' Resp. 16 ("this is not a case of mere deterioration"). Plaintiffs agree with Defendant that because "deterioration" is not defined in the policies, this Court should apply the plain meaning of the word. According to Plaintiffs, "deterioration" means "'the act or process of deteriorating,'" while "deteriorate" means "'to make inferior in quality or value: IMPAIR . . . become impaired in quality, state, or condition.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 616 (unabridged ed. 1993)). Plaintiffs argue that the plumbing fittings were not merely impaired or made inferior in quality or value by

chloramine exposure.  Instead, the fittings catastrophically failed over time, ultimately breaking

apart in chunks and rendering the plumbing system unusable for its intended purpose.

Plaintiffs acknowledge that Bekooy changed his terminology from "deterioration," which

he used in the *Victaulic* case, to "decomposition" which he uses now, to describe what occurred

to the EPDM materials after exposure to chloramine.  But, Plaintiffs note that in the liability case

against Victaulic, "deterioration" had no legal significance and the change in terminology

resulted from the consideration of the "coverage-relevant facts, as opposed to the third-party

liability facts." *Id.*  Plaintiffs argue that their loss "of an overall plumbing system usable for its

intended purpose implicates far more than purportedly deteriorated fittings, which effectively

moots the exclusion." *Id.* at 17.

As indicated, and as the parties agree, the policy does not define "deterioration."  I found

no Oregon, District of Oregon, or Ninth Circuit cases construing a similar insurance policy term

under Oregon law.  Without a policy definition, I determine the plain meaning of the term as an

"aid[] of interpretation to discern the parties' intended meaning." *Groshong*, 329 Or. at 307-08,

985 P.2d at 1287.  Dictionaries are an appropriate interpretative aid in such circumstances. *See*,

*e.g.*, *Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC*, 285 Or. App. 416, 424, 395 P.3d

892, 897 (2017) (noting that when individual terms are not defined in the policy, courts look to

dictionaries to determine a plain meaning); *see also Veloz v. Foremost Ins. Co. Grand Rapids,*

*Mich.,* 306 F. Supp. 3d 1271, 1276 (D. Or. 2018) (absent explicit definition of term in insurance

policy, court looked to dictionary definitions to interpret meaning).

Here, Defendant relies on cases, some of which in turn relied on a dictionary, setting forth

a plain meaning of "deteriorate" or "deterioration" as the gradual, progressive, breakdown of

material, or the slow-moving disintegration or corrosion of material. Plaintiffs rely on a dictionary to assert that the word means to make inferior in quality or value or to impair in quality, state, or condition. I do not find these to be competing, differing definitions. However, assuming they are, and accepting Plaintiffs' definition, the damage that occurred here is deterioration as defined. The "wholesale decomposition" of the EPDM materials that Plaintiffs assert occurred here is easily described as the EPDM materials becoming impaired in quality, state, or condition. That the materials ultimately fell apart in chunks does not mean they did not deteriorate. Thus, based on the dictionary plain meaning definition of "deterioration" as asserted by Plaintiffs, the EPDM materials deteriorated because they became impaired in quality, state, or condition.

I also do not find Plaintiffs' attempt to distance themselves from their expert's change in language from "deterioration" to "decomposition" persuasive. First, I reject a distinction based on "coverage-relevant facts" versus "third-party liability facts." Second, the *Victaulic* case, as Plaintiffs note, was not an insurance coverage case. Thus, presumably, Bekooy used words that carried no particular insurance policy meaning. In essence, then, he used words that carried an ordinary, plain meaning. That is, divorced from any insurance policy implications, Bekooy described the damage as "deterioration" because the damage was what he likely understood to be the plain meaning of that term. With the parties agreeing here that the plain meaning of deterioration controls, Bekooy's prior use of the term indicates that the damage was indeed deterioration as that word is commonly understood.

Even accepting Plaintiff's proposed definition of deterioration, the failure of the EPDM components comes within that definition. Thus, I agree with Defendant that this exclusion

applies here.

  2.  Contamination

The policy excludes "loss or damage" caused by "[**c**]**ontamination**, any cost due to

**contamination** including the inability to use or occupy property or any cost of making property

safe or suitable for use or occupancy; nor will the foregoing constitute direct physical loss or

damage insured by this policy."  Jones Decl., Ex. 22 at 7.  (Group II, Exclusion No. 5).

The policies define contaminant and contamination this way:

> **Contaminant** means anything that causes **contamination**, including but **not** limited to any solid, liquid, gaseous or thermal irritant or substance, including but not limited to fiber, smoke, vapor, soot, fumes, acids, alkalis, chemicals, biological agents and waste, including but not limited to waste materials to be recycled, reconditions or reclaimed.
>
> **Contamination** means the actual or suspected presence of any material that can cause or threaten damage to human health or human welfare; or that can cause or threaten damage, deterioration, loss of value, loss of marketability, or loss of use of property.  Such material includes, but is not limited to, any foreign substance, impurity, **contaminant**, hazardous material, poison, toxin, pathogen, pathogenic organism, bacteria, virus, disease causing agent or illness causing agent.

Jones Decl., Ex. 22 at 12 (all policies using "PRO AR 3100 (1/07)" form).[5]

Defendant asserts that the disintegrated/deteriorated EPDM materials were a contaminant

as defined by the policies.  Defendant relies on the following:

---

[5]  The policies which used the "PRO AR 4100 (04/15)" form (policy periods September 13, 2015 to September 13, 2016, and September 13, 2016 to September 13, 2017), defined "**contaminant**" to mean "anything that causes **contamination**."  Jones Decl., Ex. 30 at 11. Then, those policies defined "**contamination**" to mean: "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  *Id.* at 12.  Neither party contends that the definitions used in the policies for these two years are materially distinguishable from the definitions in the preceding years' policies.

(1) the Declaration of Mark Johnson in opposition to Steadfast's motion for summary judgment in this case in which he, the owner's representative and project manager for 12W, stated that pieces of EPDM broke away from the plumbing system and entered the building's water supply; Jones Decl., Ex. 3 at ¶ 8;

(2) Plaintiffs' Memorandum in opposition to Steadfast's Motion for Summary Judgment in this case where Plaintiffs asserted that when the plumbing components decompose, EPDM material breaks away, enters the building's drinking water, clogs aerators and filters, and renders the plumbing system unfit for use and that as a result, the plumbing system suffered comprehensive damage and failed, a "failure that posed a significant risk to the health of residents, guests, commercial tenants, employees, and patrons"; Jones Decl., Ex. 2 at 2; *see also* Kolta Aug. 15, 2018 Decl., Ex. 1 at 17-20 (Bekooy Report) (showing debris trapped by aerators);

(3) Plaintiffs' expert opinion in the *Victaulic* case that "carbon black" is a carcinogen and that carbon black has been seen to leach out of the degraded EPDM and can be ingested with the drinking water; Jones Decl., Ex. 9 at 29-31; and

(4) various allegations in the First Amended Complaint in this case. First Am. Compl. ¶¶ 15-17.

Based on these statements and allegations, Defendant argues that the residue and particles of EPDM were contaminants. The water was rendered unfit for consumption by the presence of deteriorated EPDM particles and residue. Based on the policy language, the argument is that the deteriorated EPDM particles, residue, and sludge was a material that can cause or threaten damage to human health or that can cause or threaten damage or loss of use of property, and that the deteriorated pieces are properly understood to be a foreign substance or an impurity.

Defendant cites to cases indicating that contamination occurs when there is a loss of purity, meaning something is rendered impure by contact or mixture. For example, in *Richland Valley Prods., Inc. v. St. Paul Fire & Cas. Co.*, 201 Wis. 2d 161, 548 N.W.2d 127 (1996), the court explained that "[o]ther jurisdictions have almost uniformly construed the term ["contamination"] in insurance policies in light of modern dictionary definitions" and stated that it "connotes a condition of impurity resulting from mixture or contact with a foreign substance" and "to make inferior or impure by mixture; an impairment of impurity; loss of purity resulting from mixture or contact." *Id.* at 169-70, 548 N.W.2d at 131 (internal quotation marks omitted); *see also Benson Tower Condo. Owners Ass'n. v. Victaulic Co.*, No. 3:13-cv-01010-SI, 2014 WL 5285475, at *5 (D. Or. Oct. 15, 2014) (in a products liability case brought by a different building's owners' association against the manufacturer of the same EPDM plumbing fixtures that were used in The Indigo, Judge Simon described the property damage to that building's potable water system as having resulted from "contamination caused by black particles of EPDM that are in the drinking water and that also clogged filters and appliances").

Plaintiffs' opposition arguments are grounded in Plaintiffs' position that "water" or damages for "water," are not at issue in this case and thus, the fact that the disintegrating EPDM may have contaminated the water is of no import. *See* Pls.' Resp. 17-19 (because the policy does not cover water, the cause of damage to water is irrelevant; Plaintiffs' concern over water quality and potential health issues caused by EPDM in the water was a third-party liability issue that does not bear on the first-party coverage dispute; and Plaintiffs have no request in their damages prayer for remediation of purportedly contaminated water). I reject Plaintiffs' arguments because they are belied by Plaintiffs' allegations in the First Amended Complaint and the contamination

exclusion covers the alleged property damage here.

In support of the EPDM claim, Plaintiffs allege that the "disintegration and dissolution of the EPDM Materials resulted in damage to The Indigo's potable water supply, to the domestic water plumbing systems, and to other property at The Indigo, including damage to both residential and commercial units." First Am. Compl. ¶ 15. Additionally, "[d]amage to the buildings potable water supply obviously presented the specter of harm to building residents and visitors, as well." *Id.* Plaintiffs also allege that 12W had legal obligations to "maintain the dwelling unit in a habitable condition, including the provision of plumbing facilities maintained in good working order and a water supply maintained so as to provide safe drinking water." *Id.* ¶ 16 (internal quotation marks, ellipses, and brackets omitted). 12W was obligated by law to "protect against any serious threat to the tenant's health, safety, or property and to prevent any conditions that make the dwelling unit unfit for occupancy." *Id.* ¶ 17 (internal quotation marks and brackets omitted). To maintain its legal obligations and to ensure the safety of their tenants and visitors, 12W distributed bottled water to all tenants and "promptly investigated and selected the fastest and most efficient means to repair the property damage and restore the safe functionality of The Indigo's plumbing system." *Id.* ¶ 19.

To "remedy this property damage to The Indigo's plumbing and water, and to avoid bodily injury to persons," Plaintiffs incurred almost $5 million in costs. *Id.* ¶ 21 (alleging that Plaintiffs have incurred no less than $4,826,584 for (1) the cost of diagnosing problems in the piping system and developing a scope of repair for the piping system and common elements; (2) cost to repair damaged property; (3) total cost of a third-party construction manager to furnish architectural services, obtain permits, act as the Owner's representative during the repair work,

and document the repair work to ensure it complied with various standards and regulations; (4) relocation and move-out expenses, and the cost to move and store the tenants' personal belongings during the course of the repair work, and to clean unit interiors; (5) additional cleaning costs and costs to mitigate damage; (6) lost income and extra expense associated with the repair work; (7) expenses in connection with tenants' loss of use of property; and (8) financing and carrying costs); *see also id.* ¶ 20 (repair of the damage included, but was not limited to, "removal and replacement of all EPDM Materials in The Indigo's domestic water system and repair of all property damage associated therewith").

While Plaintiffs are correct that they do not expressly seek the cost of bottled water, the allegations are reasonably construed in only one way: the disintegrating EPDM components threatened harm to both the plumbing system *and* the water supply. The investigation into repair options was at least in part motivated by 12W's legal obligations to provide safe drinking water as well as an operable plumbing system. The repairs undertaken were designed to address both the water supply and the plumbing system. The two went hand-in-hand. Thus, the damages sought for the EPDM claim are indeed for harm caused by contaminated water.

Plaintiffs argue that the potential health issues caused by the EPDM in the water are not at issue here. Instead, they assert that it was the risk of catastrophic leaks that required replacement of the entire plumbing system. But, the First Amended Complaint is devoid of any such allegation. The word "leak" does not appear anywhere in that pleading. This suggests that at least at the time Plaintiffs brought the claim, they were not relying on the risk of leaks theory.

Additionally, even if the risk of leaks was the only reason Plaintiffs replaced the plumbing system, the repairs are still not covered. The policy defines contamination to include

the "actual or suspected presence of any material . . . that can cause or threaten damage, deterioration . . . , or loss of use of property." Jones Decl., Ex. 22 at 12. The risk of leaks was caused either by the disintegrated EPDM components themselves which, because they were disintegrated, no longer worked to contain the water as intended, or, by pieces of disintegrated EPDM in the water which threatened to plug or clog pipes. The former alternative is excluded by the deterioration exclusion. The latter alternative is excluded because the sloughed off pieces or sludge was foreign material that caused or threatened damage or loss of use of property. Because the deteriorating plumbing parts could cause or threaten catastrophic leaks, there was contamination. Accordingly, even if a threat to human health did not trigger the repair work, the cost of the work is not covered under the policy because the ensuing loss is itself excluded under the deterioration and/or contamination exclusions.

D. Summary re: EPDM Claim

The loss/damage is initially covered but is then excluded by several exclusions. At a minimum, there are design-defect exclusions which Plaintiffs do not dispute. Plaintiffs fail to create an issue of fact as to their concurrent/multiple cause theory. The loss or damage is not restored under the ensuing loss provision because the ensuing loss is excluded under the deterioration and/or contamination exclusions. Thus, I grant Defendant's motion as to the EPDM claim.

III. Spandrel Glass Claim

A. What is Spandrel Glass & How is it Failing at The Indigo

According to Plaintiffs, The Indigo's "curtain wall presents as a reflective, metallic, multi-paneled monolith." Pls.' Mot. for Sum. J. 2. The "curtain wall" is made up of both spandrel glass

units and tinted, partially reflective windows.  *Id.*  The spandrel glass units are of a slightly

different, grayer shade than the tinted windows as a result of "opacifier film" which is adhered to

the glass in a spandrel glass unit.  *Id.*  Plaintiffs assert that the spandrel glass units serve three

purposes:  (1) together with the regular tinted windows, they are The Indigo's "signature feature";

(2) they are integral to the building's efficiency and associated LEED[6] certification as they

"reflect, internally collect, and disperse heat that would otherwise migrate into The Indigo and

increase its energy needs"; and (3) they "conceal the building's insulation, structural walls, and

other unfinished spaces."  *Id.*

The spandrel glass units have two panes of glass with one-half inch of airspace in

between.  The outer pane of glass has a low-e reflective coating on its interior-facing side.

Polyester opacifier film materials are adhered to the interior-facing side of the interior pane of

glass.  An illustration is found at page three of Plaintiffs' summary judgment motion.  Kolta July

26, 2018 Decl., Ex. 2 at 9,  ECF 61 (Thornton Tomasetti Report[7]).

The opacifier film material has five layers, three of which are Polyethylene terephthalate

(PET) film.  The interior most PET layer is black which renders the glass opaque to conceal the

structure's unfinished building materials.  The next layer is an adhesive layer containing

aluminum particles which provides reflectivity and the metallic appearance of the glass.  The

next layer is a clear PET layer.  Then there is another layer of adhesive with the aluminum

---

[6]  LEED stands for "Leadership in Energy and Environmental Design," and is "the most widely used green building rating system in the world."  U.S. Green Building Council website, located at https://new.usgbc.org./leed.

[7]  Defendant's glass expert is Mark Dannettel, who works for Thornton Tomassetti. Citations to his expert report are to "Thornton Tommasetti."

particles.  Finally, there is another layer of clear PET.  Thus, there are five layers, three of which are PET, two of which are the adhesive.  *See* Jones Decl., Ex. 13 at 2 (RDH Orig. Report[8]); Young Decl. ¶ 4, ECF 60.

The First Amended Complaint alleges that the opacifier film is separating and peeling away from the glass, resulting in property damage.  First Am. Compl. ¶ 40; *see also id.* ¶ 41 (asserting that the scope of the damage to the spandrel glass units and adjacent property was still under investigation).  In some locations, the problem has caused the glass to have a mottled appearance.  Jones Decl., Ex. 13 at 3, 5, 6 (RDH Orig. Report).  Some damage appears as black spots.  *Id.* at 3.  Other observed damage includes "bubbles" of the film, blisters, "tenting," and "scratch marks."  Jones Decl., Ex. 14 at 2, 7 (MEIC Report).

B.  Initial Coverage & Exclusions

Like the EPDM claim, there is no dispute that the loss/damage to the spandrel glass units is initially covered under the broad coverage grant in the all-risk policy.  And, like the EPDM claim, there is no dispute that an exclusion applies.  In this claim, it is undisputed that the cause of the harm is an improperly cured adhesive layer in the opacifier film portion of the spandrel glass units.  *See* Young Decl., Ex. 1 at 15 (RDH Orig. Report noting that the glue between laminations appears to have not correctly copolymerized; further explaining that the glue is "failing cohesively" and that the "failed adhesive cannot resist the differential stress between the laminations of the PET assembly resulting in delamination of PET laminate within the lamination glue plane"); Kolta July 26, 2018 Decl., Ex. 2 at 18 (Thornton Tomasetti Report

---

noting that the "root cause" of the failure is improper curing of the copolyester adhesives between the PET layers of film). Young Decl., Ex. 2 at 1 (RDH Rebuttal Report noting that Defendant's expert "appears in agreement . . . with respect to the root cause failure of the glue[.]"). A manufacturing defect or a materials defect is the agreed-upon cause of the problem. The policy excludes such defects. Jones Decl., Ex. 22 at 6 (Group II, Exclusion No. 2) (excluding "[d]efects in materials [and] faulty workmanship").

   C.  Concurrent/Multiple Cause Theory

   As they did with the EPDM claim, Plaintiffs contend that coverage for the defective spandrel glass units is available under a concurrent/multiple loss theory. This argument fails for two reasons. First, as with the EPDM claim, Plaintiffs fail to even mention the "efficient proximate cause" standard. Thus, they offer an incomplete analysis and proof of this theory. Because Plaintiffs do not support their argument under the proper legal standard, they fail to create an issue of fact as to the concurrent/multiple cause theory. Thus, even assuming the existence of a another non-excluded cause, they cannot defeat Defendant's motion with this argument. For the same reason, they cannot prevail on their own motion.

   Second, Plaintiffs rely on their expert's opinion that "prolonged exposure to extreme heat" is the concurrent cause of the damage to the spandrel glass units. Because "extreme heat" is not an excluded peril, it is a covered peril and because, according to Plaintiffs, the opacifier adhesive would not have failed absent "extreme heat," the damage to the spandrel glass units is covered under a concurrent/multiple cause theory. I agree with Plaintiffs that "extreme heat" is not an excluded peril. The fact that "heat" was deleted from later policies indicates an intent to omit it from the list of exclusions. Moreover, as Plaintiffs note, Defendant knew how to write a policy

including the term "extremes of temperature" and Defendant's failure to include that term in the list of exclusions indicates the intent to limit the exclusion to "changes of temperature." Kolta July 26, 2018 Decl., Ex. 1 at 38 (separate policy provision defining "boiler and machinery," and providing that coverage is conditioned on "direct physical loss or damage . . . [c]aused by, resulting from, or consisting of . . . [e]xtremes or changes of temperature."). While Defendant correctly notes that Plaintiffs' policy did not include boiler and machinery coverage and that the language is in a coverage provision, not an exclusion provision, this provision still shows that Defendant knew how to insert "extremes of temperature" into a policy when it wanted to and it did not include that language in the exclusions applicable here.

Nonetheless, Plaintiffs fail to establish that "extremes of temperature" occurred here. Plaintiffs rely on Young's opinion that the presence of "excessive temperatures" over time resulted in the glue failing. Young Decl., Ex. 1 at 15. In his Original Report he wrote: "it is our opinion that the delamination of the opacifier film has resulted from the improper copolymerization of the laminate adhesive. This improper polymerization has altered the properties of the PET assembly, such that *high heat from solar gain* results in the mottled aluminum particle migration and delamination failures observed in the field." *Id.* at 17 (emphasis added); *see also id.* at 16 (the "extent of damage is related to excessive heat associated with solar gain"); *id.* at 15 ("[i]n the presence of excessive heat over time, the glue is failing cohesively"; ". . . at excessive temperatures the lamination glue cannot restrain the stressed induced by the excessive heat loads to keep the laminations together"; and "[a]t excessive temperature, the black PET shrinks and pulls away from the top and the sides of the glass").

In response to Defendant's evidence that the climate and ambient air temperatures in

Portland are moderate compared to other cities, Young explains in his Rebuttal Report that the exterior ambient temperature does not consider the effect of surface heating of different materials or glazing units as a result of solar exposure. Young Decl., Ex. 2 at 1 (RDH Reb. Report). The focus of Young's Rebuttal Report appears to be "solar exposure" rather than ambient air temperature. But, nonetheless, his opinion remains that the temperature in the spandrel glass units was "excessive" or "extreme" and that this caused the defective product to fail. *E.g. id.* at 1, 2 ("in the absence of exposure and excessive heat within the spandrel glass units, we would expect to see no damage"; indicating that the defective copolymerizing of the glue resulted "in a failure of the film laminate to perform in the excessive heat conditions of the insulated spandrel panel in conjunction with high solar exposure in Portland, OR"; the "opacifier film would not have failed in the absence of solar exposure.").

Absent from Young's reports, however, is an explanation or definition of "prolonged," "over time" or "excessive" or "extreme." And, Plaintiffs offer no evidence of the actual temperatures inside the spandrel glass units that they contend are "excessive" or "extreme." *See* Jones Decl., Ex. 14 at 8 (MEIC report stating that "no thermal measurement data was available[,] [] the study's scope was limited[,] and only the external conditions to the site of window installment were considered"). Instead, the summary judgment record is capable of only one inference: the temperatures inside the spandrel glass units were consistent with industry standards. Dannettel explains that there was no "environmental event which led to the failure of the films." Kolta July 26, 2018 Decl., Ex. 2 at 20 (Thornton Tomasetti Report). Rather, the film failed at normal operating temperatures. *Id.* While spandrel glass units are subject to high temperatures, they are designed to perform at these temperatures. *Id.* at 18-19 (indicating that

spandrel glass units typically experience temperatures in the range of 160 to 175 degrees Fahrenheit). Even when considered in a light most favorable to Plaintiffs, the evidence shows that Plaintiffs only surmise that the internal temperature in the spandrel glass units reached 170-175 degrees Fahrenheit and then, Plaintiffs declare that this is an "extreme" temperature.

The issue is what is an "excessive" or "extreme" temperature in the context of the insurance policy. "Excessive heat" or "extreme heat" are not defined in the policy. Thus, I rely on the plain meaning of the term. The parties do not cite to an Oregon, District of Oregon, or Ninth Circuit case construing this term in a similar policy. Dictionary definitions include "existing in the highest or the greatest possible degree," and "exceeding the ordinary, usual, or expected." *Webster's Third New Int'l Dictionary* 807 (unabridged ed. 2002); *see also* www.ahdictionary.com (American Heritage online dictionary defining "extreme" in the context of synonyms for "excessive" as "[b]eing far beyond the norm"). A 1982 Texas case suggests, as do the dictionary definitions, that an "excessive heat" or "extreme heat" exclusion in an insurance policy embodies a relative concept, not an objective one. *Blaylock v. Am. Guar. Bank Liab. Ins. Co.*, 632 S.W. 2d 719 (Tex. 1982). There, damage to property located in Dallas occurred on a day when the outside temperature was about twenty-three degrees. *Id.* at 722. The evidence established that twenty-three degrees was within the normal recurring range of temperatures for Dallas. *Id.* The court interpreted the exclusion language "extremes of temperature" to mean an unexpected or unusual temperature. *Id.* ("We agree that a temperature must be unexpected or unusual in order to be extreme."). Thus, the court held that because the temperatures on the day in question were not unusual or unexpected, the exclusion for "extremes of temperatures" did not apply.

Under the plain meaning of the term, an excessive or extreme heat exclusion would apply only when the heat at issue is unusual, unexpected, or "beyond the norm." Here, the evidence in the record shows nothing more than that the temperatures inside the spandrel glass units may have reached 175 degrees Fahrenheit. While that is a high temperature, it is not unusual, unexpected, or beyond the norm for that environment. Because the industry standard for the spandrel glass units is an internal temperature of 165-175 degrees Fahrenheit, the contention that 170 degrees Fahrenheit is extreme is inconsistent with the plain meaning of the term. Thus, the product failed under its intended use and Plaintiffs fail to establish that "prolonged exposure to extreme heat" was a concurrent cause entitling them to coverage under their concurrent/multiple cause theory.

D. Ensuring/Resulting Loss Provision

In addition to the concurrent/multiple cause theory, Plaintiffs also rely on the ensuing loss provision policy language to contend that the damage to the spandrel glass units is a covered loss. Plaintiffs' argument is again premised on "prolonged exposure to extreme heat" as a cause of the damage. Plaintiffs are correct that because the policy does not exclude loss or damage caused by "extreme" or "excessive" temperatures, such loss or damage could potentially be covered. In an attempt to cement this contention, Plaintiffs spend time distinguishing "extremes of temperature" from "changes of temperature" which is a listed exclusion. Jones Decl., Ex. 22 at 7 (Group II, Exclusion No. 4). Defendant, in response, argues that the spandrel glass unit failures are as a result of changes of temperature and thus, damage is excluded, even under the ensuing loss provision.

In my opinion, the correct result here does not depend on whether there was extreme heat

or changes of temperature.  Instead, because the damage is to the spandrel glass unit, and there is no dispute that the opacifier film portion of that unit was defective, there is no ensuing loss to consider.  The spandrel glass units are a defective product.

"[A]n ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to *other* property wholly separate from the defective property itself." *Prudential Prop. & Cas.*, 2002 WL 31495830, at *19 (internal quotation marks omitted) (further explaining that an ensuing or resulting loss clause "does not reinsert coverage for excluded losses, but reaffirms coverage for secondary losses ultimately caused by excluded perils" ((internal quotation narks omitted)).  The application of an ensuing loss provision was described in an example given by the insurer in Judge Stewart's *Prudential* case:

> [I]f defectively installed roof flashing allows water to leak into the wall cavity, then subsequent damage caused by water, such as dry rot or mold, to the interior of the house is caused by the faulty workmanship and not covered.  If, however, the water migrates into an electrical box and causes an electrical short which in turn causes a fire, then the fire damage is a covered "ensuing loss."

*Id.*  Judge Stewart explained that in the example "of a water leak that causes an electrical short which starts a fire, the fire damage is a covered ensuing loss because it is an unforeseeable event occurring wholly separate from the defective property itself, and, but for the excluded peril, would otherwise be a covered loss." *Id.* at *20 (citation and internal quotation marks omitted).  She went on to explain that the mold damage at issue in the case before her which occurred when faulty workmanship allowed water to leak, was not covered under the ensuing loss provision.  *Id.*  Because, in her opinion, mold was a "natural and expected, as opposed to a separate and independent, result of water damage, it cannot be an ensuing loss." *Id.* (further stating that an "ensuing loss requires an unexpected loss due to an intervening or contributing cause other than

the mere passage of time").

In a case where the concrete floor in the plaintiff's distribution center suffered damage, Judge Ashmanskas followed Judge Stewart's *Prudential* reasoning. *Wal-Mart Stores, Inc. v. Gulf Ins. Co.*, No. Civ 04-160-AS, 2005 WL 1231076 (D. Or. May 23, 2005), *aff'd*, 250 F. App'x 221 (9th Cir. 2007). The insurers issued an all-risk insurance policy to the plaintiff. During the term of the policy, the concrete floor in the plaintiff's distribution center begin curling. The plaintiff alleged that the curling made it dangerous to use the floors, caused damage to the wheels of the forklifts requiring additional maintenance, and caused the edges of the slabs to break down. *Id.* at *1. The defendants asserted that the damage was caused by faulty design or workmanship. The plaintiff argued that the damage was caused by faulty specifications. For purposes of summary judgment only, the defendants conceded that the damage was caused by faulty specifications. *Id.* at *3.

The policy excluded the cost of "making good defective design or specifications, faulty material, or faulty workmanship; however, this exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material or faulty workmanship." *Id.* With this language, Judge Ashmanskas explained that the policy excluded the cost of making good any defective specifications. *Id.* This included the cost of correcting the specifications and the costs incurred in correcting any damage caused by the defective specifications. *Id.* Then, Judge Ashmanskas looked at the ensuing loss provision, or the "exception to the exclusion." *Id.* The plaintiff argued that this language "pulls all of its damages, with the exception of the cost of correcting the specifications, back under the Policies' protection." *Id.* Judge Ashmanskas rejected that contention.

Citing to a Washington case, a California case, and Judge Stewart's *Prudential* case, Judge Ashmanskas concluded that in addition to the cost of replacing the defective specifications which the parties agreed was excluded, the costs associated with repairing and replacing the concrete floors and associated structures was directly related to and a part of the faulty construction caused by the defective specifications and thus, were also excluded. *Id.* at **3-4 (discussing *Allianz Ins. Co. v. Impero*, 654 F. Supp. 16 (E.D. Wash. 1986) (policy excluded costs of repairs to defective concrete walls that were not in accord with specifications; court rejected the insured's argument that the cost of repairing the walls was damage resulting from faulty workmanship and covered under an ensuing loss provision; court explained that the defective concrete caused no damage to any other portion of the structure, other person or property and noted that had the wall collapsed because of the deficiencies and had the collapsing wall caused damage to some other portion of the work or to the equipment, it would be "a different case"); *Sapiro v. Encompass Ins.*, 221 F.R.D. 513, 521 (N.D. Cal. 2004) (in analyzing ensuing loss exception to a faulty workmanship exclusion, the court held that the insured could not recover for losses caused by design and construction defects; court limited the ensuing loss exception to a "loss that is separate and independent from the original peril" and denied the insured's claim for reconstruction costs because they were "neither separate nor ensuing by any legitimate measure; they are the price of repairing the predicate damage"); *Prudential*, 2002 WL 31495830 at *19 (summarizing Judge Stewart's holding)).  Accordingly, Judge Ashmanskas concluded that the ensuing loss provision did not create an exception to the exclusion.

Plaintiffs do not show a loss to "*other* property wholly separate from the defective property itself." *Prudential Prop. & Cas.*, 2002 WL 31495830, at *19 (internal quotation marks

omitted).  The damage is to the spandrel glass units.  There is no evidence, that the damage to those units has then caused a separate, secondary loss.  Although Plaintiffs assert that their LEED certification is imperiled, *see* Young Decl., Ex. 2 at 2 (RDH Rebuttal Report) (asserting that the product failure will adversely affect venting, draining, and the LEED-certified building's energy consumption), they fail to show that this is loss or damage to other property. Relatedly, that the damaged spandrel glass may impact the building's energy consumption is not loss or damage to other property.  And, accepting that the film may pile up at the bottom of a spandrel glass unit with a negative impact on venting[9] and drainage, this is also not evidence of loss or damage to other property.

The manufacturing/materials defect caused no damage to any other portion of the building.  There is no evidence of a subsequent fire, collapse, or other loss "separate and independent from the original peril."  Thus, the policy's ensuing loss provision does not reinstate coverage to Plaintiffs for the spandrel glass units as an exception to the defect-related exclusions. I grant summary judgment to Defendant on the spandrel glass claim and deny Plaintiffs' partial summary judgment motion on this claim.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[9]  It is unclear if the reference to "venting" is related to the impact on energy consumption or is a separate issue.  Either way, it remains damage to the spandrel glass unit and not to other property.

CONCLUSION

Defendant's summary judgment motion [57] is granted. Plaintiffs' motion for partial summary judgment [59] is denied.

IT IS SO ORDERED.

Dated this 18 day of December , 2018

Marco A. Hernandez
United States District Judge